IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| CANDACE Y. MARTIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:11CV408 |
| | ) | |
| CAROLYN W. COLVIN,[1] | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Candace Martin ("Plaintiff") brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act (the "Act"), as amended (42 U.S.C. §§ 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claims for Disability Insurance Benefits and Supplemental Security Income under, respectively, Titles II and XVI of the Act. The parties have filed cross-motions for judgment, and the administrative record has been certified to the Court for review.

I.  PROCEDURAL HISTORY

Plaintiff filed her applications for Disability Insurance Benefits and Supplemental Security Income on June 5, 2006, alleging a disability onset date of September 10, 2004. (Tr. 135-44.)[2]

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should be substituted for Michael J. Astrue as the Defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] Transcript citations refer to the Administrative Transcript of Record filed manually with the Commissioner's Answer [Doc. #7].

Her applications were denied initially (Tr. at 68-69, 72-79) and upon reconsideration (Tr. at 70-71, 83-92). Thereafter, Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. at 93-94.) Plaintiff, along with her attorney and an impartial vocational expert, attended the subsequent video hearing on March 13, 2009. (Tr. at 11.) The ALJ ultimately determined that Plaintiff was not disabled within the meaning of the Act (Tr. at 26) and, on March 25, 2011, the Appeals Council denied Plaintiff's request for review of the decision, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review (Tr. at 1-5).

In rendering his disability determination, the ALJ made the following findings later adopted by the Commissioner:

> 1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2009.
>
> 2. The claimant has not engaged in substantial gainful activity since September 10, 2004, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
> . . . .
>
> 3. The claimant has the following severe impairments: bipolar disorder and anxiety disorder (20 CFR 404.1521 *et seq.* and 416.921 *et seq.*).
> . . . .
>
> 4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526, 416.925 and 416.926).
> . . . .
>
> 5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: she is best suited to perform short-cycle work which does not require reading and writing skills. Furthermore, she should avoid dealing with the public or working in crowded areas.

(Tr. at 13-17.)

The ALJ then considered Plaintiff's age, education, work experience, and the above residual functional capacity ("RFC") and determined that Plaintiff was unable to perform any of her past relevant work. However, he found that Plaintiff could perform other jobs that exist in significant numbers in the national economy. (Tr. at 24.) The ALJ therefore concluded that Plaintiff was not under a disability, as defined in the Act, from her alleged onset date through the date of the decision. (Tr. at 25-26.)

II.     LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, the scope of review of such a decision is "extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1993) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472. "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[3]

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of

---

[3] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program (SSDI), established by Title II of the Act as amended, 42 U.S.C. § 401 et seq., provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program (SSI), established by Title XVI of the Act as amended, 42 U.S.C. § 1381 et seq., provides benefits to indigent disabled persons. The statutory definitions and the regulations promulgated by the Secretary for determining disability, see 20 C.F.R. pt. 404 (SSDI); 20 C.F.R. pt. 416 (SSI), governing these two programs are, in all aspects relevant here, substantively identical. " Craig, 76 F.3d at 589 n.1.

disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at the first two steps, and if the claimant's impairment meets or equals a "listed impairment" at step three, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment," then "the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[4] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the [Government] to prove that a significant number of jobs exist which the claimant could perform, despite the claimant's impairments." Hines, 453

---

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (*e.g.*, pain)." Hines, 453 F.3d at 562-63.

F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.[5]

III.   DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in "substantial gainful activity" since her alleged onset date. She therefore met her burden at step one of the sequential evaluation process. At step two, the ALJ further determined that Plaintiff suffered from two severe impairments: bipolar disorder and anxiety disorder. (Tr. at 13.) The ALJ then found at step three that these impairments did not meet or equal a disability listing. Accordingly, he assessed Plaintiff's RFC and determined that Plaintiff had no exertional limitations. However, the ALJ found that Plaintiff was "best suited to perform short-cycle work which does not require reading and writing skills" and that "she should avoid dealing with the public or working in crowded areas." (Tr. at 17.) Although the ALJ determined at step four that this RFC rendered Plaintiff incapable of returning to any of her past relevant work, he found at step five that Plaintiff could perform other jobs available in significant numbers in the national economy. (Tr. at 24.) Based on these findings, the ALJ concluded that Plaintiff was not disabled. (Tr. at 25.)

---

[5] A claimant thus can qualify as disabled via two paths through the five-step sequential evaluation process. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five.

Plaintiff now challenges the ALJ's finding that she fails to meet the requirements of 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05C (hereinafter "Listing 12.05C"). (Pl.'s Br. [Doc. #10] at 4.) Specifically, Plaintiff argues that her low IQ scores support a finding of mental retardation and, therefore, disability, at step three of the sequential analysis.

Listing 12.05C provides that:

[m]ental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifesting during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for the disorder is met when the requirements in A, B, C, or D are satisfied.
. . . .

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]

20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05. In other words, a claimant must demonstrate three elements to meet Listing 12.05C: (1) deficits in adaptive functioning manifested before age 22, (2) a valid IQ score between 60 and 70, and (3) another severe impairment. See Luckey v. U.S. Dept. of Health & Human Servs., 890 F.2d 666, 668 (4th Cir. 1989); Maresh v. Barnhart, 438 F.3d 897, 899 (8th Cir. 2006).

In the present case, Julia M. Brannon, Ph.D, a psychological consultative examiner, measured Plaintiff's IQ using the Wechsler Adult Intelligence Scale - Third Edition. This test, administered in December 2006, yielded a verbal IQ score of 60, a performance IQ score of 67, and a full scale IQ score of 59, and led Dr. Brannon to conclude, among other mental diagnoses, that Plaintiff is mildly mentally retarded. (Tr. at 399-403.) The ALJ gave "relatively little weight" to Dr. Brannon's ultimate opinion, explaining that "a lot of the claimant's problems are from

personality and a lack of motivation rather than mental retardation." The ALJ concluded that Dr. Brannon's opinion that Plaintiff is mentally retarded "is **not** consistent with [Plaintiff's] medical records and is too extreme." (Tr. at 22-23.) However, the ALJ did not address the IQ test results, other than to note that "Dr. Brannon found that the claimant's scores were reliable and valid."

Where "there is ample evidence in the record to support a determination" that a plaintiff's impairment met or equaled a listed impairment, an ALJ must explain his reasons for finding that the plaintiff's impairment did not, in fact, meet or equal the corresponding listing. Cook v. Heckler, 783 F.2d 1168, 1172 (4th Cir. 1986). In other words, an ALJ must consider whether a plaintiff's impairment meets or equals a listed impairment where there is "some significant indication in the record that the claimant suffers from that impairment." Ketcher v. Apfel, 68 F. Supp. 2d 629, 645 (D. Md. 1999). In this case Plaintiff produced evidence of (1) deficits in adaptive functioning, (2) IQ scores ranging from 59 to 67, and (3) additional impairments, namely anxiety disorder and bipolar disorder, thus reflecting evidence that would raise "some significant indication" as to each of the required criteria for Listing 12.05C. The ALJ nevertheless failed to consider whether Plaintiff's mental impairments met or equaled Listing 12.05C.

The ALJ's failing in this regard extends beyond his omission of Listing 12.05C from his discussion at step three. In the years since Cook, the Fourth Circuit has clarified that an ALJ's failure to specifically identify a particular listing in his decision does not automatically result in error; rather, the ALJ's duty at step three is fulfilled so long as his decision regarding the impairment in question "'detail[s] and amply explain[s]'" his reasoning. Russell v. Chater, 60

F.3d 824, 1995 WL 417576, at *3 (4th Cir. 1995) (Table); Shelton v. Colvin, No. 1:12-CV 279, 2013 WL 3816607, at *3 (W.D.N.C. July 22, 2013) (unpublished). Where, for example, an ALJ finds an impairment severe at step two of the analysis and then thoroughly discusses that impairment when determining the plaintiff's RFC, substantial evidence "establishes that the ALJ considered the impairment even though it was not explained [at] step three, the listing stage." Shelton, 2013 WL 3816607, at *3.

Here, in contrast, the ALJ failed to address the issue of Plaintiff's possible mental retardation in any meaningful way. Although Plaintiff's alleged "cognitive disabilities," including her low IQ scores, enrollment in special education classes, poor school performance, and subsequent drop out during seventh grade, were the very first issues identified by counsel during the administrative hearing (Tr. at 30-31, 42, 53), the ALJ did not include any level of intellectual disability among Plaintiff's impairments at step two (Tr. at 13) and omitted Listing 12.05 from his analysis at step three (see Tr. at 16-17).[6] Possible mental retardation received no further attention in the ALJ's decision beyond (1) his adoption of Dr. Gregory's statement that Plaintiff's low adaptive functioning may result from factors other than retardation and (2) his notation that Dr. Brannon's opinion was inconsistent with other evidence and "too extreme."

---

[6] As noted above, the ALJ failed to include Plaintiff's intellectual impairment as a severe impairment at step two of the sequential analysis. A severe impairment is an impairment or combination of impairments which "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c). If an ALJ finds that one or more impairments are severe at step two, he must then "consider the combined effect of all of [the] impairments" at step three to determine whether those impairments, singly or in combination, meet or equal a listing. 20 C.F.R. §§ 404.1523, 416.923. Notably, the severity finding at step two is merely a threshold determination. See Felton-Miller v. Astrue, 459 Fed. App'x 226, 230 (4th Cir. 2011) (unpublished). Because the ALJ in the present case progressed to step three based on other severe impairments, his failure to mention Plaintiff's intellectual impairment at step two would have been remedied had he discussed that impairment at Step 3. However, he failed to do so, never evaluating whether it meets or equals a listing on its own or in combination with her other severe impairments.

(Tr. at 23.) Significantly, the ALJ provides little, if any, analysis of Plaintiff's adaptive functioning levels before the age of 22.

The Social Security Administration ("SSA") "does not expressly define 'deficits in adaptive functioning' or specify the degree of deficit required (mild versus significant, for example), whether deficits must exist in one, two, or more categories of adaptive functioning, or what methodology should be used to measure deficits in adaptive functioning." Blancas v. Astrue, 690 F. Supp. 2d 464, 476-477 (W.D. Texas 2010). In fact, in revising the Listings to Impairments in 2002, the SSA specifically chose not to adopt a clearer, standardized definition for this requirement. Instead, the SSA commented as follows regarding the applicable standard:

> *The definition of MR [i.e., mental retardation] we use in our listings is consistent with, if not identical to, the definitions of MR used by the leading professional organizations.* The four major professional organizations in the United States that deal with MR have each established their own definition of MR. While all the definitions require significant deficits in intellectual functioning, as evidenced by IQ scores of approximately 70 or below, age of onset and *the method of measuring the required deficits in adaptive functioning differ among the organizations.*
> . . . .
>
> The definition of MR used by SSA in the listings is not restricted to diagnostic uses alone, nor does it seek to endorse the methodology of one professional organization over another. While capturing the essence of the definitions used by the professional organizations, it also is used to determine eligibility for disability benefits. SSA's definition establishes the necessary elements, *while allowing use of any of the measurement methods recognized and endorsed by the professional organizations.*

Blancas, 690 F. Supp. 2d at 477-478 (quoting Technical Revisions to Medical Criteria for Determinations of Disability, 67 Fed. Reg. 20018-01, at 20022 (April 24, 2002)).

The most commonly used of these methods, the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") defines adaptive functioning as "how effectively individuals cope with common life demands and how well they meet the

standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting." The DSM-IV further stipulates that "in order to be mentally retarded an individual must have significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety." Diagnostic and Statistical Manual of Mental Disorders, pp. 39-40 (4th ed. 1994).

The American Association on Intellectual and Developmental Disabilities ("AAIDD")[7] and the American Psychological Association utilize behavioral testing to provide objective definitions of adaptive behavior.[8] The AAIDD definition requires "performance that is approximately two standard deviations below the mean" in (1) "one of the following three types of adaptive behavior: conceptual, social, or practical, or (2) an overall score on a standardized measure of conceptual, social, and practical skills." Conceptual skills include "language, reading and writing, and money, time, and number concepts," while social skills include interpersonal skills and the ability to follow rules and obey laws. See Walker v. Kelly, 593 F.3d 319, 323 (4th Cir. 2010). Practical skills, i.e., activities of daily living, include "activities such as eating, personal hygiene, dressing, meal preparation, housekeeping, transportation, taking medication, money

---

[7] Until 2006, this organization was known as the American Association of Mental Retardation, or AAMR.

[8] See American Association on Intellectual and Developmental Disabilities, Intellectual Disability: Definition, Classification, and Systems of Supports, p. 43 (11th Ed. 2010); Jacobson, John W., and Mulick, James A., eds., Manual of Diagnosis and Professional Practice in Mental Retardation, p. 13 (1996). Although Dr. Brannon tested Plaintiff's adaptive behavior in the present case, she noted that Plaintiff's "emotional or mental illness-related difficulties" affected her performance, thereby limiting the value of the test results. (Tr. at 402-03.)

management, and telephone use, as well as occupational skills and maintaining a safe environment." See, e.g., Thomas v. Allen, 614 F. Supp. 2d 1257, 1279 (N.D. Ala. 2009).

The SSA regulations provide similar definitions of social functioning and activities of daily living among their general mental disorder provisions. 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00(C). Under the statute, "[s]ocial functioning refers to [a claimant's] capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals." § 12.00(C)(2). It may be assessed by evaluating a claimant's ability "to get along with others, such as family members, friends, neighbors, grocery clerks, landlords or bus drivers." Id. Similarly, a claimant's practical skills can be evaluated by assessing her "adaptive activities[,] such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for [one's] grooming and hygiene, using telephones and directories, and using a post office." § 12.00(C)(1). In addition to mirroring the AAIDD definitions, the above guidelines also closely approximate the adaptive behavior areas specified in the DSM-IV. For this reason, Courts often employ the categories listed in the DSM-IV, in conjunction with the statutory lists above, as useful markers for evaluating Plaintiff's abilities and disabilities. Durden v. Astrue, 586 F. Supp. 2d 828, 834 (S.D. Tex. 2008); Blancas, 690 F. Supp. 2d at 476 (citing Arce v. Barnhart, 185 Fed. App'x 437, 438 (5th Cir. 2006)). This approach comports with the SSA's ruling that the listings' definition of MR is consistent with the organizational definitions, although not identical to any one of them. 67 Fed. Reg. at 20,022.

In assessing a claimants' adaptive functioning, the Fourth Circuit does not require the ALJ to identify which of the above measurement methods is being applied. See Justice v. Barnhart, 431 F. Supp. 2d 617, 620 (W.D. Va. 2006). So long as the ALJ's assessment reflects

a thorough review of the criteria specified by one or more of those methods, the assessment meets the statutory requirements. Id. However, in performing such an analysis, the ALJ cannot simply choose to analyze evidence of a plaintiff's functional strengths while ignoring credible evidence of her limitations. See Blancas, 690 F. Supp. 2d at 485; Durden, 586 F. Supp. 2d at 836. To do so subverts the requirement that the ALJ's finding of fact be supported by substantial evidence.

In the present case, the ALJ's decision reflects Plaintiff's relevant testimony as follows:

> [Plaintiff] reported that she was doing okay in school before she moved to North Carolina but thereafter, she was in special education of reading, math[,] and social studies[,] and when she was in the seventh grade she missed so many days of school she quit. She never attempted to get a driver's license. She was arrested once in 1987 for writing a bad check and currently does not have a checking account.

(Tr. at 18.) The ALJ's decision also notes that Plaintiff has worked in the past, but that she quit her last job as a housekeeper in 2004 when she broke her foot. (Id.) By all accounts, her daily activities and social involvement are quite limited. (See Tr. at 18, 19, 24.) However, the ALJ found that the true extent of Plaintiff's activities "cannot be objectively verified with any reasonable degree of certainty." Moreover, "even if [Plaintiff's] daily activities are truly as limited as alleged, it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons and other factors." (Tr. at 24.) Similarly, the ALJ concluded that Plaintiff's "dependent lifestyle" could not "be rationalized by any of the objective findings in the file." (Tr. at 23.)

These conclusions fail to fully address Plaintiff's adaptive functioning under any of the various measurement methods, and fail to consider whether Plaintiff's low IQ may, in fact, provide an objective basis for many of her otherwise unexplained limitations and dependency.

The ALJ's decision, while touching on Plaintiff's low academic achievement, completely omits further, extensive evidence of Plaintiff's adaptive deficits before age 22. For instance, in addition to dropping out of school in seventh grade, the record shows that Plaintiff was sixteen at the time, indicating that she failed more than one grade before withdrawing, and that she previously earned very poor grades. (Tr. at 214-17, 286.) At the hearing, Plaintiff testified that she was in special education classes in fourth, fifth, and sixth grade, that she repeated the sixth grade, and that she left school before completing seventh grade. (Tr. at 32, 42.) After quitting school, Plaintiff was in numerous sexual relationships, resulting in five children by three different men by age 24. (Tr. at 267, 270, 286.) Social services reportedly removed the children from Plaintiff's care on more than one occasion because Plaintiff was unable to care for her home, which was in a housing project, and was neglecting the children. (Tr. at 267, 270, 323.) By 1995, when Plaintiff was 25 years old, she had surrendered custody of the children, and they were adopted by other families. (Tr. at 286, 323, 452.) It appears that Plaintiff has rarely, if ever, lived alone.

Although the ALJ's decision reflects that Plaintiff most recently worked for a year as a housekeeper, the record reveals that this job actually involved working for her uncle for about ten months. (Tr. at 59, 247.) Otherwise, and contrary to the ALJ's statement at the hearing that Plaintiff "has worked for years and years," Plaintiff's work records demonstrate that she maintained her past jobs for a maximum of three to four months each, and sometimes much less. (Tr. at 151-57, 247.) She rarely, if ever, earned enough to classify her work as substantial gainful activity. (Tr. at 13, 151.) The above factors, along with her lack of driver's license or bank account, provide some evidence that Plaintiff experiences deficits in practical skills,

including paying bills and maintaining a residence. Compare 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00(C)(1). In short, Plaintiff unquestionably presented evidence of her adaptive deficits in a number of areas, and the ALJ's decision does not address the evidence in assessing Plaintiff's adaptive functioning under any of the possible measurement methods.

Defendant nevertheless contends that substantial evidence supports the ALJ's ultimate determination in this case because, in Defendant's view, Plaintiff did not actually have deficits in adaptive functioning prior to age 22. However, it is not the role of a reviewing court to decide *de novo* whether a plaintiff is entitled to benefits; "rather, it can only assess whether the Commissioner has applied the appropriate legal standards and whether findings of fact are supported by substantial evidence." Justice, 431 F. Supp. 2d at 620 (citing Monguer v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983)). Because, in the present case, the ALJ failed to analyze whether Plaintiff met the requirements of Listing 12.05C, and because the limited analysis of Plaintiff's adaptive functioning skills fails to consider all of the evidence presented, remand is required.[9] On remand, the ALJ should analyze the evidence to determine whether Plaintiff's mental impairments meet Listing 12.05C, including (1) utilizing a method of measuring Plaintiff's adaptive functioning which is consistent with the professional standards set out above, (2) addressing the evidence of Plaintiff's abilities and inabilities according to the skill areas set out

---

[9] In reaching this conclusion, the Court also notes that in formulating Plaintiff's RFC, the ALJ concluded that Plaintiff could perform work "which does not require reading or writing skills," but the ALJ did not reconcile this determination with any conclusions as to Plaintiff's adaptive functioning. The Fourth Circuit has found that "the evidence that [claimant] could barely read or write was a clear manifestation of mental retardation occurring before age twenty-two." Luckey v. U.S. Dept. of Health & Human Services, 890 F.2d 666, 668 (4th Cir. 1989). To the extent that the ALJ's findings of illiteracy may affect the analysis of adaptive functioning in this case, the Court leaves these issues for further consideration by the ALJ on remand.

in one or more of these standards, and (3) obtaining further evaluations of Plaintiff's adaptive functioning, if necessary.

IT IS THEREFORE RECOMMENDED that the Commissioner's decision finding no disability be REVERSED, and that the matter be REMANDED to the Commissioner under sentence four of 42 U.S.C. § 405(g). The Commissioner should be directed to remand the matter to the ALJ for proceedings consistent with this recommendation. To this extent, Defendant's Motion for Judgment on the Pleadings [Doc. #11] should be DENIED, and Plaintiff's Motion for Summary Judgment [Doc. #9] should be GRANTED. However, to the extent that Plaintiff's motion seeks an immediate award of benefits, it should be DENIED.

This, the 20th day of August, 2014.

/s/ Joi Elizabeth Peake
United States Magistrate Judge